**LYONS & ASSOCIATES, P.C.**
Lara K. DiFabrizio
Attorney I.D. 032741996
LYONS & ASSOCIATES, P.C.
76 E. Main Street
Somerville, NJ 08876
(908) 575-9777
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MS. NADIA BAXTER<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. MARSH, JR.; MONROE TOWNSHIP; MONROE TOWNSHIP POLICE DEPARTMENT; RYAN BORKOWSKI; MONROE BOARD OF EDUCATION; ANGELO DESTEFANO; and JOHN DOES 1-10 (fictitious individuals representing currently unidentified members of both the Monroe Township Police Department or other law enforcement agencies, and of Williamstown High School/Board of Education) in their official and individual capacities; all jointly and severally liable in their official and individual capacities,<br><br>Defendants. | DOCKET NUMBER<br><br>CIVIL ACTION NO.<br><br>COMPLAINT<br>JURY TRIAL REQUESTED<br>AS TO ALL COUNTS |

## COMPLAINT

Plaintiff, NADIA BAXTER, by way of Complaint against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1. This civil-rights action arises from Defendant Michael J. Marsh, Jr.'s repeated use of chokeholds and potentially deadly force against Plaintiff Nadia Baxter on October 11, 2024, in the front lobby of Williamstown High School, and from the institutional response that followed. What began when a mother came to school with urgently needed menstrual-hygiene

products for her daughter escalated into a violent physical encounter captured by the school's surveillance camera.

2. New Jersey's Use of Force Policy imposes upon every law-enforcement officer an affirmative duty to de-escalate and permits force only as a last resort when a lawful objective cannot reasonably be accomplished through verbal commands, tactical deployment, critical decision-making, or de-escalation techniques. The Policy specifically warns officers never to engage in unnecessary or overly aggressive conduct that creates the very situation in which force becomes necessary.

3. The surveillance video depicts Marsh doing precisely the opposite. Rather than creating time and distance, employing tactical communication, or otherwise attempting to reduce and stabilize the encounter, Marsh closes the distance between himself and Ms. Baxter, moves directly into her personal space, and points his finger in her face. Ms. Baxter responds verbally and points back, but does not strike Marsh or initiate physical contact. Marsh then escalates the verbal encounter into a physical one, grabbing Ms. Baxter's arm and then her neck and driving her backward into nearby lobby chairs. Marsh thereafter repeatedly placed Ms. Baxter in chokeholds, including wrapping his arm around her neck, lifting her from the chairs, taking her to the floor, and again placing her in a chokehold while she was on the ground.

4. New Jersey's Use of Force Policy also requires every use of force to be accurately reported and subjected to meaningful command-level review, including review of available video evidence and the circumstances leading to the use of force. Yet Marsh's official Use of Force entry characterized the encounter merely as a "Take Down" and failed to report either a "Chokehold" or "Carotid Artery Restraint," although both were separately available reporting categories. The objective surveillance video provided MTPD with a direct means to test the accuracy and completeness of Marsh's report.

5. Ms. Baxter filed an Internal Affairs complaint concerning Marsh's conduct only days after the incident. Nevertheless, after an investigation lasting approximately 176 days, nearly six months, MTPD declared Marsh "EXONERATED." The Department acknowledged that the incident occurred but concluded that Marsh's conduct violated no rule, regulation, standard operating procedure, directive, or training. Thus, despite Ms. Baxter's prompt complaint, the objective surveillance video, Marsh's materially incomplete Use of Force reporting, and the Department's mandatory review obligations, MTPD identified no use-of-force violation, no reporting deficiency, and no need for remedial training, discipline, or corrective action.

6. Plaintiff brings this action to redress Marsh's repeated use of chokeholds and objectively excessive and potentially deadly force, the resulting unconstitutional seizure and prosecution, the fabrication and preservation of materially false evidence, the failure to intervene, and the municipal, supervisory, and conspiratorial conduct that permitted, concealed, reviewed, and ultimately exonerated the violations alleged herein.

## PARTIES

7. Plaintiff NADIA BAXTER ("Ms. Baxter") is an African American woman and resident of the State of New Jersey. At all times relevant to this action, and continuing to the present, Ms. Baxter has been employed as a Care Manager with CGS CMO, where she works with court-appointed youth, and as a Support Coordinator with Advantage Supports, where she provides services to adults receiving assistance through the New Jersey Division of Developmental Disabilities ("DDD"). Ms. Baxter earned a Bachelor of Science degree in Criminalistics and Criminal Science and a master's degree in Criminal Justice and Human Services from Monroe

University. At all relevant times, Ms. Baxter's minor daughter, R.B., was a student at Williamstown High School.[1]

8. Defendant MICHAEL J. MARSH, JR. ("Marsh") was, at all times material, employed by the Monroe Township Police Department as a Special Law Enforcement Officer Class III ("SLEO III") and assigned to Williamstown High School. Marsh directly participated in the events alleged herein and is sued in his individual and official capacity.

9. Defendant MONROE TOWNSHIP ("Monroe") is a municipal entity in Gloucester County, New Jersey, organized under the laws of the State of New Jersey and responsible for the policies, customs, practices, training, supervision, investigation, discipline, and conduct of its police personnel.

10. Defendant RYAN BORKOWSKI ("Borkowski"), now retired, was at all times material the Chief of Police of MTPD and acted under color of state law. Before becoming Chief, Borkowski directly oversaw school resource officers and SLEOs, including Marsh, from approximately 2021 through 2024. He is sued in his official and individual capacity.

11. Defendant MONROE TOWNSHIP BOARD OF EDUCATION (the "Board") is a public body responsible for the governance, administration, policies, practices, training, supervision, security procedures, and conduct of its employees and agents at Williamstown High School. The Board is sued under 42 U.S.C. § 1983 to the extent the constitutional injuries alleged herein were caused by its official policies, customs, practices, decisions of final policymakers, and/or deliberately indifferent failures to train or supervise.

12. Defendant ANGELO DESTEFANO ("DeStefano") was, at all times material, the Principal of Williamstown High School and acted under color of state law. As Principal, DeStefano was responsible for administering and implementing school policies and procedures, including

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a)(3), Ms. Baxter's daughter, who was a minor at all relevant times, is identified by her initials, R.B., in this filing.

policies governing parent item drop-offs, student release, school security, and interactions between school personnel and law enforcement. DeStefano personally participated in the events alleged herein and is sued in his individual and official capacity.

13. Defendants JOHN DOES 1 through 10 are presently unidentified police officers, supervisors, Internal Affairs personnel, school administrators, school-security personnel, Board employees, guidance personnel, policymakers, custodians of records, agents, or other persons who participated in, authorized, reviewed, ratified, acquiesced in, failed to intervene in, concealed, or otherwise caused or contributed to the conduct alleged herein. Plaintiff will amend the Complaint to substitute their true identities when learned through discovery.
14. At all relevant times, the individual law-enforcement and school Defendants acted under color of state law.
15. Plaintiff has retained Lyons & Associates, P.C. and seeks reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

16. This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims under 42 U.S.C. § 1983 and the United States Constitution.
17. This Court has supplemental jurisdiction over Plaintiff's related claim under the New Jersey Civil Rights Act pursuant to 28 U.S.C. § 1367.
18. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391 because the events giving rise to these claims occurred in Gloucester County, New Jersey, and Defendants reside or conduct official business within this District.
19. Plaintiff demands a trial by jury on all issues so triable.

## FACTS

## I. THE OCTOBER 11, 2024 INCIDENT

20. On October 11, 2024, Ms. Baxter arrived at Williamstown High School because R.B. had an immediate need for menstrual-hygiene products during the school day. Ms. Baxter brought tampons for R.B. in a small, soft-sided bag with a flap.

21. Ms. Baxter was not attempting to deliver food, a forgotten assignment, or a convenience item. She came to provide her daughter with urgently needed menstrual-hygiene products.

22. The Williamstown High School Student Handbook contained a written provision entitled "OUTSIDE DELIVERIES / PARENT ITEM DROP OFF."

23. That provision did not prohibit parents from dropping off items for their children. Rather, it "requested" that parents and guardians avoid dropping off food and other items during the school day and expressly instructed that "[a]ll items being dropped off must be placed in the cabinet outside of the main entrance."

24. The Handbook separately prohibited "Outside deliveries for food or any other item," stating that such deliveries would be "turned away" and that "money will be lost." The written policy thus distinguished between parent item drop-offs, for which it prescribed a designated location, and prohibited outside deliveries.

25. Nothing in the written policy stated that a parent who came to the school with menstrual-hygiene products for her child was trespassing, engaging in disorderly conduct, or otherwise violating the law.

26. School personnel nevertheless informed Ms. Baxter that she would not be permitted to provide the tampons to her daughter.

27. Rather than force the school to accept the items or circumvent that decision, Ms. Baxter elected to remove R.B. from school for the remainder of the day.

28. At that point, any dispute concerning the delivery of the tampons was over. Ms. Baxter was waiting to retrieve R.B. so that the two could leave the school.

29. Principal Angelo DeStefano approached Ms. Baxter, and Ms. Baxter stated that she wished to retrieve her daughter.

30. As R.B. approached the lobby from inside the school, Marsh positioned himself in front of the lobby door and shut the door, preventing her from entering and causing her to move quickly to avoid being struck.

31. Ms. Baxter did not approach Marsh. Instead, she moved to Marsh's left, toward the adjacent window, and signaled to R.B. with her hand to come out.

32. Marsh remained positioned in front of the door through which R.B. was attempting to enter and directed Ms. Baxter to sit down and/or step back. Ms. Baxter continued to state that she wanted her daughter and questioned why Marsh was preventing her from retrieving R.B.

**A. Marsh Escalates Rather Than De-Escalates the Encounter**

33. At that point, the encounter was verbal. Ms. Baxter was unarmed and had not struck, assaulted, touched, or otherwise made physical contact with Marsh. The surveillance video depicts no threatening physical conduct by Ms. Baxter before Marsh initiated force.

34. As a New Jersey law-enforcement officer, Marsh was governed by the New Jersey Attorney General Use of Force Policy, including its Core Principles.

35. Those Core Principles require that force be used only as a last resort when necessary to accomplish lawful objectives that cannot reasonably be achieved through verbal commands, critical decision-making, tactical deployment, or de-escalation techniques.

36. The Policy further imposes an affirmative duty to de-escalate. De-escalation includes verbal or non-verbal communication undertaken to reduce, stabilize, or eliminate the immediacy of a threat and may be used to create the time necessary to position additional resources so that a situation can be resolved with the least amount of force necessary.

37. Among the de-escalation techniques recognized by the Policy are Strategic Redeployment, through which an officer repositions to increase space and time to react to a subject; Tactical Communication, involving verbal techniques designed to avoid or minimize force; and Tactical Positioning, which makes advantageous use of position and distance to reduce the risk of injury and avoid or reduce the need for force.

38. Most significantly here, the Policy expressly prohibits officers from engaging in unnecessary, overly aggressive, or otherwise improper actions that create a situation in which force becomes necessary.

39. The surveillance video depicts Marsh doing precisely the opposite of what those de-escalation principles required.

40. At most, Marsh was confronted with a civilian who was upset, verbally challenging him, and using words later characterized as derogatory. Nothing depicted on the surveillance video before Marsh initiated force shows Ms. Baxter threatening Marsh with physical harm or engaging in physically threatening conduct.

41. Those circumstances called for de-escalation, not escalation. Yet rather than maintain or increase distance, employ tactical communication, or otherwise attempt to reduce and stabilize the encounter, Marsh closed the distance himself, entered Ms. Baxter's personal space, positioned himself face to face with her at extremely close range and pointed his finger directly in her face.

42. Ms. Baxter responds verbally and points back at Marsh.

43. Nothing Ms. Baxter said, including any words later characterized as derogatory, created an objectively reasonable threat of death or serious bodily injury that could justify Marsh's use of repeated chokeholds or potentially deadly force.

44. Further, Ms. Baxter's responsive gesture is not accompanied by physical contact. She does not strike Marsh, touch him, attempt to strike him, or initiate physical force.

45. Marsh does not strategically redeploy, increase the distance between them, employ tactical communication, withdraw, or otherwise attempt to stabilize the verbal encounter.

46. Instead, Marsh escalates it into a physical encounter.

**B. Marsh Initiates Physical Force and Repeatedly Places Ms. Baxter in Chokeholds**

47. The surveillance video shows Marsh initiate the physical contact.

48. Marsh first grabs Ms. Baxter by the arm.

49. Almost immediately thereafter, Marsh places his hand upon and around Ms. Baxter's neck/throat area and, using that grip and pressure to her neck, forcibly shoves her backward into the nearby lobby chairs.

50. Thus, the objective sequence preceding Marsh's first use of physical force is significant: Marsh prevents R.B. from entering the lobby and closes the door; Ms. Baxter moves to Marsh's left, toward the adjacent window rather than toward Marsh, and signals to R.B. with her hand to come out; the encounter remains verbal; Marsh thereafter closes the distance between himself and Ms. Baxter, enters her personal space, and points his finger in her face; Ms. Baxter points back without touching him; and Marsh then initiates physical force, including force directed to Ms. Baxter's neck and throat.

51. Only after Marsh initiates physical force does the encounter become a physical struggle.

52. During the struggle at the chairs, Marsh again places Ms. Baxter in a chokehold, applying substantial pressure to her neck and throat and causing pain, difficulty breathing, fear, shock, and disorientation.

53. Marsh's chokehold was not a single, fleeting or incidental contact with Ms. Baxter's neck.

54. Marsh thereafter places Ms. Baxter in another chokehold, wrapping his arm around her neck and using that hold to lift and/or pull her from the chairs and forcibly take her to the floor.

55. When Ms. Baxter attempts to see what is happening to R.B., who is being physically restrained, Marsh again engages Ms. Baxter on the ground and again places her in a chokehold while positioned over her.

56. Accordingly, Plaintiff alleges that Marsh employed multiple and repeated chokeholds during separate stages of the encounter: at the chairs, while taking Ms. Baxter from the chairs to the floor, and again while she was on the ground, rather than a single incidental or momentary contact with her neck.

**C. The Chokeholds and the Governing Restrictions Upon Deadly and Potentially Lethal Force**

57. Core Principle Three of the New Jersey Use of Force Policy, entitled "Duty to Use Only Objectively Reasonable, Necessary, and Proportional Force," provides that officers "shall use the least amount of force that is objectively reasonable, necessary, and proportional to safely achieve the legitimate law enforcement objective under the circumstances."

58. The Policy further mandates that "[f]orce shall never be used as a retaliatory or punitive measure."

59. The Policy requires that deadly force be used only as an absolute last resort and in strict compliance with the Policy.

60. The Policy additionally requires officers to avoid other actions creating a substantial risk of death or serious bodily injury except under the strictest conditions authorized by the Policy.

61. Chokeholds are inherently dangerous and potentially lethal uses of force because they can interfere with breathing and/or blood flow and thereby create a substantial risk of death or serious bodily injury.

62. At the time Marsh initiated force, Ms. Baxter was unarmed, had not struck him, had not threatened him, had not initiated physical contact with him, and presented no objectively reasonable threat of death or serious bodily injury.

63. There was therefore no circumstance requiring Marsh to resort to a chokehold, much less repeated chokeholds, as an absolute last resort to protect himself or another person from an imminent threat of death or serious bodily injury.

64. Nor was the force employed the least amount of force that was objectively reasonable, necessary, and proportional to safely accomplish any legitimate law-enforcement objective under the circumstances.

65. To the contrary, Marsh himself had escalated the encounter by closing the distance between himself and Ms. Baxter, entering her personal space, pointing his finger in her face, and then initiating physical contact after Ms. Baxter verbally responded and pointed back.

66. The temporal sequence further supports a reasonable inference that Marsh's initial resort to force was not necessary to accomplish a legitimate law-enforcement objective, but instead retaliatory, following immediately upon Ms. Baxter verbally challenging his conduct and pointing back at him.

67. Significantly, Marsh did not announce that Ms. Baxter was under arrest until after he had initiated force, repeatedly applied force to her neck and throat, forced her into the lobby chairs, and the encounter had progressed to the floor, where Marsh was positioned over her.

68. After announcing that Ms. Baxter was under arrest, Marsh attempted to place her arms behind her back. Ms. Baxter advised Marsh that she was disabled and physically unable to place her left arm behind her back. Despite being advised of that physical limitation, Marsh continued attempting to force her left arm behind her back.

**D. The Encounter Occurred Publicly Within the School**

69. The incident occurred in the front lobby of Williamstown High School, a public area within the school.

70. An interior viewing area was located above the lobby, from which individuals could observe the events occurring below.

71. While Ms. Baxter remained on the ground and R.B. was being restrained and arrested, individuals gathered in or passed through the viewing area above the lobby.

72. The surveillance video depicts a school employee directing individuals in that area to continue moving rather than remain and observe the events below.

73. Marsh's use of force against Ms. Baxter and the arrest of both Ms. Baxter and R.B. therefore occurred in view of members of their own school community, substantially increasing Ms. Baxter's humiliation and emotional distress.

**E. School Administrators and Personnel Participate in the Encounter**

74. The events giving rise to this action occurred inside Williamstown High School and arose directly from Ms. Baxter's attempt to provide urgently needed menstrual-hygiene products to her daughter and her subsequent decision to remove R.B. from school.

75. DeStefano was the Principal of Williamstown High School and personally interacted with Ms. Baxter before the physical encounter. As Principal, he knew or reasonably should have known the school's written policies and procedures governing parent item drop-offs and the release of students to their parents during the school day.

76. The written Handbook expressly contemplated parent item drop-offs and prescribed a location for such items. Nothing in the written policy identified Ms. Baxter's attempt to provide menstrual-hygiene products to her daughter as unlawful conduct.

77. When the school would not permit the delivery, Ms. Baxter elected to remove R.B. from school. DeStefano knew that Ms. Baxter was R.B.'s mother and that Ms. Baxter was seeking to retrieve her daughter so that they could leave.

78. Plaintiff is unaware of any custody order, disciplinary restriction, medical restriction, or other lawful basis that prohibited Ms. Baxter from retrieving her daughter from school. As Principal,

DeStefano knew or should have known whether any such restriction existed and knew or should have known the school procedures governing a parent's request to sign out and retrieve a child during the school day.

79. DeStefano was therefore in a position to resolve the underlying school issue by correctly applying the school's own policies, facilitating R.B.'s release to her mother, and preventing an ordinary parent-school interaction from escalating into a police confrontation.

80. Multiple Williamstown High School administrators and employees were present during the ensuing encounter. Based upon Plaintiff's present knowledge, those persons included DeStefano; at least three school-security employees; Assistant Principal McKinney; a guidance counselor; and additional school personnel whose identities are presently unknown.

81. The surveillance video depicts school personnel in close proximity to the encounter as Marsh's interaction with Ms. Baxter escalated from a verbal disagreement into the physical seizure and restraint described above.

82. The force employed against Ms. Baxter was not a single instantaneous act. As alleged above, Marsh employed separate and repeated applications of force, including multiple chokeholds during distinct stages of the encounter.

83. During that continuing encounter, school personnel had time and opportunity to observe what was occurring, summon assistance, clarify the circumstances giving rise to the encounter, communicate Ms. Baxter's parental status and purpose, and take reasonable action to prevent or reduce the continuing escalation.

84. Rather than protecting Ms. Baxter and R.B from the escalating encounter, school personnel became physically involved with R.B. while Marsh continued to restrain Ms. Baxter.

85. DeStefano himself physically grabbed and/or pulled R.B. during the incident.

86. Plaintiff further alleges, based upon information learned after the incident, that a Williamstown High School guidance counselor went to the ground with and physically restrained R.B. during the encounter.

87. R.B. was attempting to reach and/or respond to her mother while witnessing her mother being forcibly restrained by police.

88. School-security personnel and other school employees were likewise present and had an opportunity to observe material portions of the encounter.

89. At no point before Marsh initiated force did DeStefano resolve the underlying dispute by advising Marsh that Ms. Baxter's initial presence concerned a parent item drop-off contemplated by school policy or by facilitating Ms. Baxter's request to retrieve her daughter and leave.

90. Nor, once the encounter became physical and continued through multiple applications of force, did DeStefano take reasonable action to protect Ms. Baxter from the continuing use of force. Instead, DeStefano affirmatively became physically involved with R.B. while Ms. Baxter remained under physical restraint.

91. Following the incident, Williamstown High School possessed surveillance video objectively depicting the encounter. That video was material to determining who initiated the physical confrontation, the nature and degree of force used against Ms. Baxter, and the accuracy of the official account subsequently used against her.

92. Assistant Principal McKinney also personally handled Ms. Baxter's property immediately following the encounter. The surveillance video depicts McKinney retrieving the bag, opening it, placing a cellular telephone inside it, and collecting additional property.

93. The identities, precise roles, instructions, communications, observations, and conduct of the additional school employees depicted on the surveillance video are presently within Defendants' possession and control and will be further established through discovery.

**F. The School District's Subsequent Suspension of R.B. and Restrictions on Ms. Baxter.**

94. At the time of the incident, R.B. was an exemplary student at Williamstown High School. She maintained straight A's, had no prior disciplinary problems, had never been late to school, participated in the school's track and basketball teams, and served as President of the African American Cultural Society.

95. Following the October 11, 2024 incident, Williamstown High School imposed an out-of-school suspension upon R.B. In an October 14, 2024 email to Ms. Baxter, Assistant Principal Kathleen McKinney stated that R.B. had been suspended for allegedly "assaulting staff members."

96. McKinney further advised that homebound tutoring would be arranged, that R.B. was required to undergo a psychiatric evaluation with Dr. Hewitt, and that the suspension would remain in effect pending that evaluation and a determination by the superintendent and Board of Education. McKinney also informed Ms. Baxter that neither she nor R.B. was permitted on school campuses.

97. On November 6, 2024, Ms. Baxter contacted McKinney and DeStefano by email, advising that R.B. had completed the psychiatric evaluation on November 1, 2024, and requesting information concerning the next steps and the scheduling of a meeting.

98. According to Ms. Baxter, R.B. appeared before the Board of Education on November 14, 2024, at which time the surveillance video of the October 11 incident was reviewed and a decision was made to permit her eventual return to school.

99. On November 27, 2024, Acting Superintendent Dr. Brian J. McBride advised Ms. Baxter in writing that a re-admittance meeting had been scheduled for December 2, 2024. McBride identified himself, Principal DeStefano, Assistant Principal McKinney, and R.B.'s guidance counselor as the persons who would attend.

100. McBride further advised that a "Success Contract" had been developed for R.B. and reportedly provided to Ms. Baxter on November 19, 2024. The contract was to be reviewed at

the December 2 meeting, and R.B. would be placed on administrative probation until she satisfied applicable eligibility requirements governing participation in school athletics, extracurricular activities, and other school activities.

101. R.B. was permitted to return to school on December 2, 2024, approximately seven weeks after the incident. According to Ms. Baxter, R.B. was required to sign the Success Contract and satisfy a point-based system as part of the conditions governing her return.

102. Following her return, R.B. remained subject to restrictions affecting her participation in extracurricular activities and senior-year events. In December 2024, she attempted to attend a school basketball game but was escorted from the building. School officials also removed her from her position as President of the African American Cultural Society. She was ultimately permitted to attend her senior prom and graduation.

103. In his November 27, 2024 email, McBride expressly stated that a "Notice of No-Trespassing" issued to Ms. Baxter on October 15, 2024, remained in effect until revoked by him. McBride further advised that Ms. Baxter was required to obtain his permission before entering any property owned by the Monroe Township Board of Education and that failure to comply would result in notification to the Monroe Township Police Department.

104. McBride granted Ms. Baxter a limited exception to attend the December 2 re-admittance meeting and to drop R.B. off at Williamstown High School immediately thereafter. Ms. Baxter was subsequently granted another limited exception to attend R.B.'s graduation. According to Ms. Baxter, she has never been informed that the broader restriction was revoked.

105. These disciplinary and administrative measures were imposed following the encounter in which Ms. Baxter alleges that Marsh initiated physical force against her. They demonstrate the direct and continuing involvement of school administrators and District officials in the institutional response to the incident.

**G. The Bag and the Claimed Injury to Marsh**

106. Throughout the physical encounter, Ms. Baxter held a small, soft-sided bag with a flap in her left hand. The flap remained closed throughout the encounter.

107. The surveillance video does not depict Ms. Baxter swinging the bag at Marsh, striking Marsh with the bag, or otherwise using the bag as a weapon.

108. Rather, during the relevant portion of the encounter, Ms. Baxter's left arm holding the bag is extended outward and away from Marsh.

109. At the time of the encounter, the bag contained the tampons Ms. Baxter had brought for R.B.

110. Ms. Baxter had two cellular telephones on her person, one work-issued telephone and one personal telephone. The surveillance video depicts Ms. Baxter using one telephone while waiting for R.B. and subsequently placing it into her pants pocket. According to Ms. Baxter, the second telephone was in her coat pocket.

111. Following the physical confrontation, Assistant Principal Kathleen McKinney, dressed in black, opened Ms. Baxter's previously closed bag, which appeared to be secured by a clasp or other fastening mechanism. McKinney retrieved a cellular telephone from the floor and placed it inside the bag. She also picked up a large hoop earring belonging to Ms. Baxter from the floor. McKinney then searched Ms. Baxter's clothing pockets and removed additional personal belongings, including what appeared to be a second cellular telephone from her coat pocket. McKinney placed personal items into the bag, although portions of her handling of these belongings were obscured by individuals moving through the camera's field of view. The recording establishes that McKinney opened the bag and placed personal property inside it after the physical confrontation.

112. The surveillance video depicts the bag remaining closed throughout the physical encounter and does not show a telephone falling or otherwise emerging from inside it. Rather,

the video depicts Ms. Baxter placing a telephone into her pants pocket before the encounter and school personnel subsequently retrieving a telephone from the floor and her coat pocket.

113. Accordingly, any subsequent observation, inventory, photograph, report, or other record depicting a cellular telephone inside Ms. Baxter's bag does not establish that the telephone was inside the bag during the physical encounter.

114. Marsh later claimed that during the physical struggle he was struck in the ear by Ms. Baxter's hand and/or what was characterized as her "purse."

115. The surveillance video materially undermines any suggestion that Ms. Baxter intentionally swung or struck Marsh with the bag.

116. Moreover, any alleged contact between Ms. Baxter and Marsh occurred, if at all, after Marsh had already initiated physical force and placed Ms. Baxter in a chokehold.

117. Such subsequent alleged contact could not retroactively provide justification for Marsh's initial decision to seize Ms. Baxter, initiate physical force, or employ the first chokehold.

118. Nor could any alleged contact during the ensuing struggle authorize repeated chokeholds or force greater than was objectively reasonable, necessary, and proportional under the circumstances.

119. For weeks following the incident, Ms. Baxter suffered significant physical pain as well as psychological and emotional injury.

120. At the time of the incident, Ms. Baxter was approximately five feet five inches tall and weighed approximately 180 pounds. Marsh was over six feet tall and weighed at least approximately 225 pounds.

## II. OFFICIAL USE-OF-FORCE REPORTING AND THE CLAIMED OFFICER INJURY

121. Marsh failed to activate his body-worn camera during his encounter with Ms. Baxter, including during the escalation of the encounter, his use of force, and Ms. Baxter's arrest. Accordingly, no body-worn-camera recording from Marsh captured those events.

122. Following the incident, Marsh was required to report his use of force through the New Jersey Attorney General statewide Use of Force reporting system.

123. In the publicly available incident data associated with Marsh's use of force against Ms. Baxter, the incident type is identified as "Disturbance (drinking, fighting, disorderly)," the field reflecting whether an officer was injured is reported as "True," and the force employed is identified as a "Take Down."

124. The reporting interface separately provided options for "Chokehold" and "Carotid Artery Restraint." Neither was selected.

125. Plaintiff alleges, however, that Marsh repeatedly placed her in chokeholds during multiple stages of the encounter.

126. The discrepancy between a reported "Take Down" and Plaintiff's allegation of repeated chokeholds concerns not merely terminology, but the nature, severity, and potential lethality of the force employed and the accuracy of official reporting concerning that force.

127. Marsh further reported that an officer had been injured and subsequently pursued a Workers' Compensation claim arising from the October 11, 2024 encounter.

128. On November 6, 2024, Qual-Lynx, acting as third-party claims administrator for Monroe Township, wrote to Ms. Baxter, identified Monroe Township as the insured and Marsh as the claimant, and asserted that Marsh had been injured as a result of Ms. Baxter's purported "negligent, reckless and/or intentional acts."

129. The claimed officer injury, its alleged mechanism, Marsh's account of the encounter, the condition and contents of Ms. Baxter's closed bag, and the surveillance video were all matters capable of investigation and verification.

## III. THE REQUIRED MEANINGFUL COMMAND-LEVEL REVIEW

130. The New Jersey Attorney General Use of Force Policy requires every use of force to receive a meaningful command-level review pursuant to written departmental policy.

131. The Policy requires that review to occur at multiple supervisory levels and requires examination of available sources of information concerning the incident, including video, reports, officer and witness statements, medical records, and records of injuries.

132. The review is not limited to determining whether an officer was authorized to use some degree of force. It requires meaningful examination of the circumstances that led to the use of force, the force actually employed, and whether different tactics or decisions could have improved the outcome.

133. The Policy further requires review for compliance with the duty to de-escalate, the requirement that force be a last resort, proportionality, and the obligation to employ the least amount of force necessary.

134. Reviewing supervisors are required to determine what action, if any, should follow, including remedial training, policy changes, administrative or disciplinary action, or, where appropriate, referral for criminal prosecution.

135. The law-enforcement executive, or an authorized command-level designee where permitted, is further required to review the use-of-force investigation and approve or reject the recommendations arising from that review.

136. Thus, MTPD was required to meaningfully evaluate not merely Marsh's description of the incident, but the objective surveillance video and the conduct that preceded his first use of physical force.

137. MTPD's review also provided an opportunity to determine why Marsh failed to activate his body-worn camera during the encounter, whether that non-activation complied with

applicable departmental requirements, and whether it warranted supervisory, remedial, disciplinary, or other corrective action.

138. A meaningful review of that video necessarily presented the Department with the critical sequence: a verbal disagreement; Marsh closing the physical distance between himself and Ms. Baxter; Marsh entering her personal space; Marsh pointing his finger in her face; Ms. Baxter pointing back without initiating physical contact; and Marsh thereafter initiating physical force.

139. That sequence directly implicated the Policy's requirements concerning de-escalation, strategic positioning, tactical communication, force as a last resort, proportionality, the least amount of force necessary, and the prohibition against unnecessary or overly aggressive officer conduct that creates a situation in which force becomes necessary.

140. The subsequent chokeholds alleged by Ms. Baxter additionally implicated the Policy's stringent restrictions upon deadly and potentially lethal force and conduct creating a substantial risk of death or serious bodily injury.

141. Nevertheless, Plaintiff is unaware of any finding arising from the required command-level review that Marsh violated the Use of Force Policy, failed to de-escalate, employed an improper chokehold, inaccurately reported his force, or required remedial training or discipline.

## IV. INTERNAL AFFAIRS COMPLAINT AND CATEGORICAL EXONERATION

142. On or about October 16, 2024, only days after the incident, Ms. Baxter filed a complaint with MTPD Internal Affairs concerning Marsh's conduct.

143. Ms. Baxter also sought video recordings of the incident and was informed that such materials had to be obtained through an attorney.

144. Ms. Baxter thereafter retained criminal-defense counsel, who on January 7, 2025 served a formal discovery demand seeking, among other things, video recordings of the incident.

145. Before the ultimate disposition of her Internal Affairs complaint, the only substantive contact Ms. Baxter received concerning the investigation was an interview in or about November 2024.

146. Internal Affairs had, or through an adequate investigation should have obtained and reviewed, the surveillance video, officer reports, Use of Force submissions, witness information, records concerning Marsh's claimed injury, records or information concerning Marsh's failure to activate his body-worn camera, and the results of the Department's command-level Use of Force review.

147. Those materials provided a direct means to compare Marsh's official characterization of the encounter with objective evidence.

148. They also permitted Internal Affairs to determine whether Marsh complied with his affirmative duty to de-escalate before resorting to force and whether his own actions unnecessarily escalated the encounter.

149. They further permitted Internal Affairs to examine Plaintiff's allegation that Marsh repeatedly placed her in chokeholds against Marsh's official reporting of merely a "Take Down."

150. Nevertheless, on April 10, 2025, approximately 176 days after Ms. Baxter filed her Internal Affairs complaint, MTPD advised her that Investigation No. PD-0811-24-0020 concerning "SRO Marsh" had been completed.

151. MTPD announced that Ms. Baxter's complaint against Marsh was "EXONERATED."

152. The Department acknowledged that "[t]he alleged incident did occur," but nevertheless concluded that it "didn't violate rules, regulations, standard operating procedures, directives or training."

153. That conclusion was categorical.

154. It meant that, following both the mandatory Use of Force review and the Internal Affairs process, MTPD identified no violation arising from an encounter in which the objective video depicts Marsh closing the distance between himself and a civilian during a verbal disagreement, pointing in her face, initiating physical contact after she points back, and thereafter engaging in the physical encounter during which Ms. Baxter alleges he repeatedly placed her in chokeholds.

155. The disposition did not explain how Marsh's conduct complied with his affirmative duty to de-escalate.

156. It did not explain how closing the distance between himself and Ms. Baxter and pointing in her face comported with the Policy's strategic-deployment, tactical-communication, or tactical-positioning principles.

157. It did not explain whether the Department considered the Policy's prohibition against unnecessary or overly aggressive officer conduct that creates a situation in which force becomes necessary.

158. It did not identify what force Internal Affairs determined Marsh actually employed or explain how it reconciled Plaintiff's allegations and the surveillance video with Marsh's report of a "Take Down."

159. Nor did the disposition identify any remedial training, counseling, correction of Marsh's force reporting, discipline, policy change, or other corrective action.

160. The disposition likewise did not identify whether Marsh's failure to activate his body-worn camera was investigated, whether any explanation for the non-activation was accepted or rejected, whether the non-activation complied with applicable departmental requirements, or whether any remedial, supervisory, disciplinary, or other corrective action concerning the non-activation was considered or imposed.

161. Upon information and belief, Marsh did not receive meaningful remedial training, counseling, discipline, or other corrective action arising from the incident.

162. The significance of MTPD's response is therefore not simply that Ms. Baxter disagrees with the result of her Internal Affairs complaint.

163. The Department had objective video evidence against which to measure its officer's conduct and had a statewide Use of Force Policy expressly requiring de-escalation, force as a last resort, the least objectively reasonable, necessary and proportional force, stringent restrictions upon deadly and potentially lethal force, intervention by fellow officers, accurate reporting, and meaningful supervisory review.

164. Yet MTPD ultimately concluded that the incident violated none of its rules, regulations, standard operating procedures, directives, or training.

## V. PRE-SUIT EFFORTS TO OBTAIN SUPERVISORY AND ACCOUNTABILITY RECORDS

165. Before filing this action, Plaintiff sought through the New Jersey Open Public Records Act ("OPRA") records bearing directly upon MTPD's supervision, investigation, and accountability concerning Marsh, including records concerning prior use-of-force incidents, civilian complaints, disciplinary history, Internal Affairs findings, supervisory reviews, early-warning-system entries, and corrective actions.

166. Plaintiff also specifically requested records concerning Marsh's failure to activate his body-worn camera during the October 11, 2024 incident, including any explanation for the non-activation, supervisory review or findings concerning it, and any disciplinary or corrective action taken or considered.

167. The Township did not produce the requested incident-specific BWC records and likewise did not produce the requested Internal Affairs, disciplinary and complaint-history, supervisory-review, early-warning-system, and corrective-action records, asserting that those categories constituted or pertained to Internal Affairs records. The Township instead produced general departmental policies, including a general BWC policy and a separate SLEO III General Order, together with Marsh's training-certificate history.

168. Accordingly, facts concerning Marsh's prior complaint and use-of-force history, supervisory notice, early-warning indicators, the Department's review of his BWC non-activation, and any discipline or corrective action remain within Defendants' possession and control. Plaintiff therefore pleads allegations concerning those matters upon information and belief pending discovery.

## VI. WITHHELD VIDEO AND CRIMINAL PROCEEDINGS

169. Following the October 11, 2024 incident, Ms. Baxter was arrested and charged with simple assault under N.J.S.A. 2C:12-1(a)(1), resisting arrest under N.J.S.A. 2C:29-2(a)(1), and disorderly conduct under N.J.S.A. 2C:33-2(a)(2).

170. The criminal matter proceeded through multiple appearances in the Woolwich Joint Municipal Court.

171. On January 7, 2025, Ms. Baxter's criminal-defense counsel formally demanded discovery, including the surveillance video.

172. The requested surveillance video was not produced to defense counsel until November 10, 2025.

173. During the period in which the government had not produced the video to Ms. Baxter's counsel, Marsh personally possessed a copy of the surveillance video on his cellular telephone.

174. On at least one municipal-court appearance, Marsh was observed in the courthouse repeatedly viewing the surveillance video while the charges against Ms. Baxter remained pending.

175. In late August or early September 2025, Ms. Baxter was able to view the surveillance footage, and her criminal-defense attorney thereafter reviewed it in connection with her defense.

176. After the prosecutor reviewed the surveillance video, the prosecution offered a negotiated disposition pursuant to which the assault and resisting-arrest charges would be dismissed and Ms. Baxter would resolve the matter through a municipal ordinance.

177. On February 25, 2026, Ms. Baxter appeared before the Woolwich Joint Municipal Court for disposition of the charges arising from the October 11, 2024 incident.

178. At the outset of the proceeding, the prosecution proposed dismissing the criminal charges and resolving the matter through a plea to a Monroe Township Code Violation.

179. At the State's request, the Municipal Court dismissed the simple-assault and resisting-arrest charges. The remaining disorderly-conduct charge was amended to a violation of Monroe Township Code § 215-2, a municipal general-nuisance ordinance.

180. Ms. Baxter reluctantly entered a guilty plea solely to that municipal ordinance violation.

181. Ms. Baxter did not want to plead guilty to any offense arising from the October 11, 2024 incident and continued to maintain that she had not assaulted Marsh.

182. Ms. Baxter is employed as a Care Manager with CGS CMO, working with court-appointed youth, and as a Support Coordinator with Advantage Supports, serving adults receiving DDD services. She feared that continued criminal charges alleging that she assaulted and resisted a police officer could jeopardize her employment, professional standing, and livelihood.

183. Ms. Baxter holds a Bachelor of Science degree in Criminalistics and Criminal Science and a Master's degree in Criminal Justice and Human Services from Monroe University.

184. Faced with continuing to defend criminal charges that threatened the career she had built in criminal justice and human services or accepting a negotiated disposition eliminating the assault and resisting-arrest charges, Ms. Baxter reluctantly accepted the municipal-ordinance disposition.

185. Her fear of losing her employment was a substantial and decisive reason for that decision; the disposition was not an admission that Marsh's account of the physical encounter was accurate.

186. During the plea colloquy, Ms. Baxter explained that the verbal confrontation escalated only after Marsh shut the door on R.B. as she attempted to enter the foyer, causing Ms. Baxter to become upset because she believed Marsh had nearly injured her daughter.

187. Ms. Baxter acknowledged that the verbal disagreement in the school foyer became heated, that voices were raised, and that she used words toward Marsh that could be characterized as derogatory.

188. Nothing in the factual basis for the plea established that Ms. Baxter threatened Marsh with physical harm. Ms. Baxter made no such admission, and the prosecution made no such allegation during the colloquy.

189. Derogatory speech, even during a heated verbal disagreement, did not itself establish a physical threat requiring the use of force and did not eliminate Marsh's obligation to employ de-escalation techniques before resorting to force.

190. Nor did the factual basis establish that Ms. Baxter initiated physical contact with Marsh.

191. Indeed, when the Court asked whether Ms. Baxter had put her hands on anyone, Ms. Baxter responded, "No."

192. When asked whether she had hit anyone with the bag she was holding, Ms. Baxter again responded, "No, not to my recollection."

193. Instead, Ms. Baxter explained that Marsh grabbed her first by the neck and that, as a reflex, she may have attempted to remove his hand from her throat, stating that she possibly could have made contact with him during that effort. The surveillance video does not depict Ms. Baxter striking Marsh or intentionally making contact with him during that reflexive response.

194. The Court clarified that Ms. Baxter was not even certain that she had struck Marsh, and Ms. Baxter confirmed that she did not remember doing so.

195. Thus, nothing in Ms. Baxter's factual basis for the municipal ordinance plea constituted an admission that she threatened Marsh, initiated physical contact, intentionally struck Marsh, struck him with the tampon bag, or presented a threat of death or serious bodily injury.

196. More fundamentally, the allegation does not alter the objective chronology. Before any such alleged contact occurred, Marsh had already initiated the physical encounter and placed Ms. Baxter in a chokehold.

197. The Court accepted Ms. Baxter's plea solely to the amended municipal ordinance violation.

198. Upon application of Ms. Baxter's counsel, the Court expressly granted a civil reservation with respect to the plea.

## VII. PUBLICITY, HUMILIATION, AND REPUTATIONAL HARM

199. The arrest of Ms. Baxter and R.B. rapidly became a matter of public attention.

200. News media responded to the school shortly after the incident, including television news helicopters, and the incident received coverage in local media and in the greater Philadelphia media market.

201. Although Ms. Baxter and R.B. were not identified by name in certain media coverage, the incident occurred within their own school community, where students, parents, faculty, staff, and others knew or readily could determine the identities of the mother and daughter involved.

202. The public nature of the arrests was particularly humiliating because members of the school community had been able to observe portions of the incident from the viewing area above the lobby while Ms. Baxter remained on the ground and R.B. was being restrained and arrested.

203. The subsequent criminal charges compounded that humiliation by publicly casting Ms. Baxter as a person accused of assaulting and resisting a police officer.

204. For approximately sixteen months, Ms. Baxter lived with those accusations while working professionally in the fields of care management and support coordination, serving vulnerable youth and adults with developmental disabilities.

205. The incident, arrests, publicity, criminal accusations, and prolonged prosecution caused Ms. Baxter substantial humiliation, embarrassment, anxiety, emotional distress, reputational harm, and fear concerning her employment and professional standing.

## VIII. MUNICIPAL AND SUPERVISORY LIABILITY

206. Monroe Township and its policymakers were responsible for establishing and enforcing systems reasonably designed to ensure that MTPD officers, including SLEO IIIs assigned to its schools, complied with constitutional requirements and applicable Attorney General directives through appropriate training, supervision, command-level review, investigation, discipline, retraining, and corrective action.

207. Those responsibilities included appropriate training, supervision, and enforcement concerning de-escalation; strategic redeployment; tactical communication; tactical positioning;

force as a last resort; objectively reasonable, necessary and proportional force; use of the least amount of force necessary; the prohibition against retaliatory or punitive force; restrictions upon deadly and potentially lethal force; the duty to intervene; truthful Use of Force reporting; and meaningful command-level review.

208. Upon information and belief, before becoming Chief, Borkowski directly oversaw school resource officers and SLEOs, including Marsh, from approximately 2021 through 2024.

209. Monroe and MTPD had notice before Ms. Baxter's incident of allegations of excessive force and officer misconduct, including prior federal civil-rights litigation involving MTPD personnel and an alleged violation of the New Jersey Attorney General Use of Force Policy.

210. Plaintiff alleges that Monroe nevertheless maintained or tolerated customs or practices permitting excessive force, inadequate de-escalation, inaccurate or misleading reporting concerning force and resistance, inadequate supervisory review of uses of force, inadequate investigation of force complaints, and inadequate discipline, retraining, or corrective action when officer conduct violated constitutional or departmental requirements.

211. The institutional response to Ms. Baxter's encounter is evidence of those alleged customs and practices.

212. MTPD had objective surveillance video depicting the circumstances immediately preceding and during Marsh's use of force; contemporaneous Use of Force reporting; knowledge that Marsh failed to activate his body-worn camera; a mandatory command-level review process; an Internal Affairs complaint filed within days; information concerning Marsh's claimed injury; and Plaintiff's allegation of repeated chokeholds.

213. The Department therefore had multiple opportunities to meaningfully determine whether Marsh complied with his duty to de-escalate; whether he unnecessarily escalated the encounter; whether the repeated chokeholds alleged by Plaintiff complied with restrictions upon deadly or potentially lethal force; whether Marsh accurately reported the force he

employed; why Marsh failed to activate his BWC; and whether the non-activation warranted supervisory, remedial, disciplinary, or other corrective action.

214. Nevertheless, MTPD identified no violation and categorically "EXONERATED" Marsh.

215. The Department likewise identified no violation of any "rules, regulations, standard operating procedures, directives or training."

216. Upon information and belief, no meaningful remedial training, counseling, discipline, correction of force reporting, or other corrective action followed.

217. Plaintiff alleges that discovery will establish the extent of Marsh's prior use-of-force and complaint history; what supervisory or early-warning information existed concerning Marsh; what review occurred concerning his failure to activate his BWC; who reviewed the surveillance video and Use of Force reporting; what findings were made during command-level and Internal Affairs review; what information was communicated to policymakers; and whether the Department's categorical determination that the incident violated none of its policies, directives, or training was consistent with broader customs and practices concerning de-escalation, use of force, reporting, supervision, investigation, discipline, and accountability.

218. The foregoing allegations concerning Monroe's customs and practices are based upon the information presently available to Plaintiff, including the objective surveillance evidence, Marsh's Use of Force reporting, the Department's mandatory review procedures, Plaintiff's prompt Internal Affairs complaint, the ultimate exoneration of Marsh, and the Township's response to Plaintiff's pre-suit requests for supervisory and accountability records. Additional evidence concerning prior incidents, supervisory notice, Internal Affairs practices, early-warning information, discipline, and corrective action is uniquely within Defendants' possession and control and will be the subject of discovery.

219. Plaintiff further alleges that Monroe and its policymakers knew or should have known of the obvious risk that constitutional violations would occur if officers were permitted to escalate encounters unnecessarily, employ excessive or potentially lethal force, fail to intervene, inaccurately characterize force, and thereafter escape meaningful supervisory review and corrective action.

220. The policies, customs, practices, failures of training and supervision, and deliberately indifferent failures alleged herein were moving forces behind the violations of Ms. Baxter's constitutional rights and caused or contributed to her injuries.

**COUNT ONE**
**EXCESSIVE FORCE — 42 U.S.C. § 1983 / FOURTH AMENDMENT**
**Against Defendant Marsh**

221. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

222. Marsh seized Plaintiff and intentionally employed physical force against her.

223. At the moment Marsh initially resorted to force, Plaintiff was visibly unarmed, had not struck or physically attacked Marsh, and did not present an objectively reasonable threat of death or serious bodily injury.

224. The objective surveillance video captures the sequence preceding Marsh's first use of force: Marsh closes the distance between himself and Plaintiff, enters her personal space and points directly in her face; Plaintiff responds verbally and points back without touching him; Marsh then grabs Plaintiff's arm and immediately thereafter grabs Plaintiff by the neck and forcibly drives her backward into the lobby chairs.

225. Plaintiff alleges that Marsh thereafter repeatedly places her in chokeholds during multiple stages of the encounter, including at the chairs, while using a chokehold to lift and/or pull her from the chairs and take her to the floor, and again while Plaintiff is on the ground.

226. Marsh's repeated chokeholds caused Plaintiff pain, difficulty breathing, fear, shock and disorientation and exposed her to a substantial risk of death or serious bodily injury.

227. Marsh later claimed Plaintiff struck him in the ear with her hand and/or what he characterized as a "purse." The video does not depict Plaintiff swinging the small bag at Marsh

or intentionally striking him with it, and any alleged contact occurred, if at all, only after Marsh had initiated physical force and employed the first chokehold.

228. Even assuming some degree of force became permissible during the ensuing struggle, Marsh was constitutionally prohibited from employing force greater than was objectively reasonable, necessary, and proportional to the circumstances.

229. The governing New Jersey Use of Force Policy required Marsh to de-escalate where feasible, use force only as a last resort, employ the least amount of objectively reasonable, necessary, and proportional force, and use deadly force only as an absolute last resort.

230. Marsh did the opposite. He escalated a verbal encounter, initiated physical contact, and repeatedly employed chokeholds against an unarmed woman who had not struck or physically threatened him before he initiated force.

231. Marsh's official Use of Force entry nevertheless reported only a "Take Down" and failed to report either a "Chokehold" or "Carotid Artery Restraint."

232. Marsh's repeated use of chokeholds and potentially deadly force was unnecessary, objectively unreasonable, excessive, and grossly disproportionate to the circumstances confronting him.

233. Marsh thereby violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure and excessive force.

234. As a direct and proximate result, Plaintiff suffered physical injury and pain, psychological trauma, humiliation, emotional distress, and other damages. Plaintiff seeks compensatory and punitive damages and attorneys' fees and costs under 42 U.S.C. § 1988.

**COUNT TWO**
**MALICIOUS PROSECUTION — 42 U.S.C. § 1983 / FOURTH AMENDMENT**
**Against Defendant Marsh and Responsible Doe Defendants**

235. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

236. Following the October 11, 2024 incident, Plaintiff was charged with, among other offenses, simple assault under N.J.S.A. 2C:12-1(a)(1) and resisting arrest under N.J.S.A. 2C:29-2(a)(1).

237. Marsh initiated, caused, influenced, and/or participated in the initiation and continuation of those criminal charges by supplying materially false, misleading, and incomplete

information concerning the October 11, 2024 encounter and by omitting material information concerning his own conduct and use of force.

238. In particular, Plaintiff alleges that Marsh materially misrepresented and/or omitted the sequence in which physical contact occurred, including that Marsh himself closed the distance between the parties, entered Plaintiff's personal space, pointed his finger directly in her face, and thereafter initiated physical contact after Plaintiff verbally responded and pointed back without threat or touching him.

239. The objective surveillance video depicts Marsh initiating the physical encounter by first grabbing Plaintiff by the arm and then grabbing Plaintiff's neck and forcibly driving her backward into the lobby chairs.

240. Plaintiff further alleges that Marsh thereafter repeatedly placed her in chokeholds during multiple stages of the encounter, including at the lobby chairs, while taking her from the chairs to the floor, and again while she was on the ground.

241. Notwithstanding the nature and degree of force employed, Marsh's official Use of Force submission characterized his force merely as a "Take Down" and failed to report either a "Chokehold" or "Carotid Artery Restraint," although those were separately available reporting categories.

242. Marsh further claimed that Plaintiff struck him in the ear with her hand and/or what was characterized as her "purse." The objective surveillance video does not depict Plaintiff swinging the small, soft-sided bag at Marsh or intentionally striking him with it.

243. More fundamentally, any alleged physical contact between Plaintiff and Marsh occurred, if at all, only after Marsh had already initiated physical force against Plaintiff and grabbed her by the neck. Such subsequent contact could not retroactively establish probable cause for Marsh's initial seizure or justify a materially false portrayal of Plaintiff as the person who initiated the physical confrontation.

244. Plaintiff's subsequent municipal-court plea colloquy further confirms that Plaintiff did not admit Marsh's version of the physical encounter. When specifically asked whether she had put her hands on anyone, Plaintiff answered, "No."

245. When asked whether she had hit anyone with the bag she was holding, Plaintiff again denied doing so to her recollection.

246. Plaintiff instead explained that Marsh grabbed her first and placed his hand on her throat**,** causing her reflexively to attempt to remove his hand. Plaintiff stated only that she "possibly" could have made contact with Marsh during that reflexive effort and expressly stated that she did not remember doing so. The surveillance video does not depict Ms. Baxter striking Marsh or intentionally making contact with him during that reflexive response.

247. The Municipal Court recognized the limited nature of that statement, confirming that Plaintiff was not even certain that she had struck Marsh.

248. Nothing in the factual basis for Plaintiff's municipal-ordinance plea established that Plaintiff threatened Marsh with physical harm, intentionally struck Marsh, struck him with the bag, or initiated the physical confrontation. Plaintiff made no admission that she threatened Marsh, and the prosecution made no such allegation during the plea colloquy.

249. Rather, the factual basis for the municipal-ordinance disposition concerned the verbal disturbance in the school foyer. Plaintiff acknowledged that the encounter became heated, that voices were raised, and that she used words toward Marsh that could be characterized as derogatory.

250. Those circumstances were materially different from the assaultive and resisting conduct alleged in the criminal charges against Plaintiff.

251. Plaintiff alleges that Marsh's materially false and misleading account, together with his material omissions concerning his own initiation of physical force and repeated use of

chokeholds, caused or substantially influenced the institution and continuation of the simple-assault and resisting-arrest charges against Plaintiff.

252. Without Marsh's materially false, misleading, and incomplete account concerning Plaintiff's purported assaultive conduct, the sequence of physical contact, the force Marsh himself employed, and the circumstances of his claimed injury, probable cause did not exist to initiate or continue the simple-assault and resisting-arrest charges.

253. The criminal prosecution continued for approximately sixteen months and required Plaintiff to appear repeatedly in municipal court while facing criminal accusations that she had assaulted and resisted a police officer.

254. During a substantial portion of that prosecution, the objective surveillance video had not been produced to Plaintiff's criminal-defense counsel despite a formal discovery demand, while Marsh himself possessed a copy of the surveillance video and was observed repeatedly viewing it on his cellular telephone at the courthouse.

255. On February 25, 2026, the State dismissed the simple-assault and resisting-arrest charges.

256. Plaintiff entered a guilty plea solely to an amended violation of Monroe Township Code § 215-2. The factual basis for that municipal-ordinance plea concerned the heated and verbally disorderly encounter in the school foyer and did not include an admission that Plaintiff assaulted Marsh, resisted arrest, threatened Marsh with physical harm, intentionally struck Marsh, or initiated the physical confrontation.

257. Upon application by Plaintiff's counsel, the Municipal Court expressly granted a civil reservation with respect to the municipal-ordinance plea.

258. Plaintiff does not predicate this malicious-prosecution claim upon the municipal-ordinance violation. This Count concerns the simple-assault and resisting-arrest charges that were dismissed at the State's request.

259. Marsh acted maliciously and/or for a purpose other than bringing Plaintiff to justice, including, as Plaintiff alleges, to justify his own initiation and escalation of the physical encounter, conceal or minimize his repeated use of chokeholds and potentially deadly force, and portray Plaintiff rather than himself as the physical aggressor.

260. As a consequence of the criminal proceedings, Plaintiff suffered a deprivation of liberty consistent with a Fourth Amendment seizure, including arrest, handcuffing, processing, and compelled appearances in court in connection with the prosecution.

261. The prosecution caused Plaintiff substantial humiliation, anxiety, emotional distress, reputational injury, legal expense, and fear concerning her employment, professional standing, and livelihood.

262. As a direct and proximate result of the foregoing conduct, Plaintiff suffered the constitutional and compensable injuries alleged herein and is entitled to compensatory damages, punitive damages against the responsible individual Defendants, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT THREE**
**FABRICATION OF EVIDENCE — 42 U.S.C. § 1983 / FOURTEENTH AMENDMENT**
**Against Marsh and Responsible Doe Defendants**

263. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

264. The Fourteenth Amendment prohibits law-enforcement officers from knowingly fabricating materially false evidence and causing that evidence to be used to initiate or continue a criminal prosecution.

265. Plaintiff alleges that Marsh knowingly created, supplied, caused to be supplied, and/or permitted materially false and misleading evidence concerning the October 11, 2024 encounter, including the identity of the physical aggressor, the sequence in which physical contact occurred, Plaintiff's alleged assaultive conduct, the nature and extent of Marsh's own force, and the circumstances surrounding Marsh's claimed injury.

266. Objective surveillance video materially contradicts the portrayal of Plaintiff as the person who initiated the physical confrontation. The video depicts Marsh closing the distance between himself and Plaintiff, entering her personal space and pointing directly in her face; Plaintiff responding verbally and pointing back without touching him; and Marsh thereafter initiating physical contact, including force directed to Plaintiff's neck and throat.

267. Marsh first grabs Plaintiff by the arm and then grabs her neck and forcibly shoves her backward into the lobby chairs. Plaintiff alleges that Marsh thereafter repeatedly places her in chokeholds during separate stages of the encounter.

268. Nevertheless, Marsh's official Use of Force submission characterized his force merely as a “Take Down” and failed to report either a “Chokehold” or “Carotid Artery Restraint,” notwithstanding the nature and degree of force alleged by Plaintiff.

269. Marsh further claimed that Plaintiff struck him in the ear with her hand and/or what was characterized as her “purse.” The surveillance video does not depict Plaintiff swinging the small bag at Marsh or intentionally striking him with it.

270. More fundamentally, any alleged contact between Plaintiff and Marsh occurred, if at all, only after Marsh had already initiated physical force against Plaintiff, including force directed to her neck and throat.

271. Plaintiff's subsequent municipal-court plea colloquy is consistent with that sequence. When specifically asked whether she put her hands on anyone, Plaintiff answered “No.” When asked whether she struck anyone with the bag, Plaintiff again denied doing so to her recollection.

272. Plaintiff explained that Marsh grabbed her first and placed his hand on her throat, and that, as a reflex, she attempted to remove his hand and possibly could have made contact with him during that effort. The surveillance video does not depict Plaintiff intentionally striking Marsh with the bag or her hand.

273. Plaintiff did not admit threatening Marsh, intentionally striking Marsh, striking him with the bag, or initiating physical contact with him.

274. The materially false and misleading account supplied by Marsh transformed an encounter in which Plaintiff alleges that Marsh initiated physical force and repeatedly employed chokeholds into one in which Plaintiff was accused of assaulting and resisting a police officer.

275. As a direct result of that account, Plaintiff was charged with, among other offenses, simple assault and resisting arrest and was subjected to a criminal prosecution lasting approximately sixteen months.

276. There was a reasonable likelihood that, absent the allegedly fabricated and materially misleading evidence concerning Plaintiff's purported assaultive conduct and the sequence of the physical encounter, Plaintiff would not have been charged with simple assault and/or resisting arrest.

277. On February 25, 2026, the State dismissed both the simple-assault and resisting-arrest charges. Plaintiff's municipal-ordinance plea was based upon the separate verbal disturbance occurring in the school foyer and did not include an admission that Plaintiff assaulted Marsh or initiated the physical confrontation.

278. Marsh's conduct was intentional, knowing, reckless, and/or undertaken in bad faith and deprived Plaintiff of her right to due process under the Fourteenth Amendment.

279. As a direct and proximate result, Plaintiff suffered loss of liberty, compelled court appearances, legal expense, reputational injury, humiliation, emotional distress, fear for her employment and professional standing, and other compensable damages.

**COUNT FOUR**
**FAILURE TO INTERVENE — 42 U.S.C. § 1983**
**Against DeStefano and Responsible Doe Defendants**

280. Defendant DeStefano was not a passive or incidental observer of the events giving rise to this action. As Principal of Williamstown High School, he was personally involved in the underlying dispute from its inception, including the refusal to permit Ms. Baxter to deliver feminine hygiene products to R.B. and the subsequent refusal to facilitate Ms. Baxter's request to retrieve her daughter from school. DeStefano remained only a few feet away as Marsh prevented R.B. from entering the lobby and escalated the verbal encounter into a physical confrontation. Despite his knowledge of the circumstances, his proximity to the encounter, and his opportunity to intervene, DeStefano took no action to de-escalate the situation or prevent Marsh's use of force. Following the incident, DeStefano also participated in the decision to suspend R.B. from school, notwithstanding her previously exemplary academic and disciplinary record.

281. DeStefano observed and/or had a reasonable opportunity to observe Marsh's escalating interaction with Plaintiff and the continuing applications of force described herein. Because the force occurred through multiple distinct stages rather than instantaneously, Plaintiff alleges that DeStefano had time and opportunity to take reasonable action to prevent or reduce the continuing constitutional deprivation.

282. DeStefano did not intervene to protect Plaintiff and instead affirmatively became physically involved with R.B. during the incident by grabbing and/or pulling her while Plaintiff remained subject to Marsh's physical restraint.

283. To the extent discovery establishes that DeStefano or responsible school Doe Defendants intentionally assisted, facilitated, encouraged, or prolonged the unconstitutional seizure or use of force, Plaintiff alleges their personal participation in the deprivation of her constitutional rights.

284. Plaintiff seeks compensatory and punitive damages against DeStefano and the responsible Doe Defendants in their individual capacity, together with attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT FIVE**
**FALSE ARREST / FALSE IMPRISONMENT — 42 U.S.C. § 1983 / FOURTH AMENDMENT**
**Against Marsh and Responsible Doe Defendants**

285. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

286. Plaintiff alleges that Marsh caused her arrest and detention without probable cause at the time the seizure was initiated.

287. At the time Marsh initially seized Plaintiff and employed physical force, Plaintiff had not struck Marsh, threatened physical harm, or otherwise engaged in conduct providing probable cause for the assault or resisting-arrest charges subsequently lodged against her.

288. Any alleged contact during the physical struggle occurred only after Marsh initiated the seizure and use of force.

289. The simple-assault and resisting-arrest charges were ultimately dismissed by the State.

290. As a direct and proximate result of the unlawful seizure, Plaintiff suffered loss of liberty, physical and emotional injury, humiliation, and other damages.

**COUNT SIX**
**NEW JERSEY CIVIL RIGHTS ACT — N.J.S.A. 10:6-2**
**Against Marsh, DeStefano, and Responsible Doe Defendants**

291. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

292. The New Jersey Civil Rights Act provides a cause of action for the deprivation or interference with rights secured by the Constitution or laws of the United States and the Constitution or laws of New Jersey.

293. Marsh, acting under color of law, subjected Plaintiff to objectively unreasonable and excessive force and an unreasonable seizure.

294. DeStefano and responsible school Doe Defendants, acting under color of law, are liable to the extent their own affirmative participation, assistance, facilitation, or knowing failure to act despite a reasonable opportunity to prevent or reduce the continuing deprivation caused or contributed to the violation of Plaintiff's protected rights.

295. The conduct of Marsh, DeStefano, and responsible Doe Defendants, to the extent alleged herein, deprived Plaintiff of rights secured by the United States Constitution and the New Jersey Constitution.

296. As a direct and proximate result, Plaintiff suffered physical injury, pain, emotional distress, humiliation, loss of liberty, and other damages and is entitled to all relief available under the NJCRA.

**COUNT SEVEN**
**MUNICIPAL LIABILITY — 42 U.S.C. § 1983 / MONELL**
**Against Monroe Township**

297. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

298. A municipality is liable under 42 U.S.C. § 1983 where a constitutional injury is caused by an official policy or custom, including deliberately indifferent failures to train, supervise, investigate, or discipline that are a moving force behind the violation.

299. Plaintiff alleges that Monroe maintained, tolerated, or exhibited deliberate indifference to customs or practices of permitting excessive force; inadequate de-escalation; inaccurate or misleading reporting concerning force and resistance; inadequate supervisory and command-level review of uses of force; inadequate investigation of force complaints; and inadequate discipline, retraining, or corrective action when officer conduct violated constitutional or departmental requirements.

300. Plaintiff further alleges deliberate indifference in training, supervision, investigation, and discipline concerning de-escalation, force as a last resort, repeated chokeholds and other potentially deadly force, intervention, truthful force reporting, and meaningful command-level review.

301. Before Plaintiff's incident, Monroe had notice of allegations of excessive force and officer misconduct, including prior federal civil-rights litigation involving MTPD personnel.

302. The post-incident response provides additional evidence of the alleged preexisting customs and practices. MTPD had contemporaneous reports, objective surveillance evidence, knowledge that Marsh failed to activate his BWC, Plaintiff's prompt Internal Affairs complaint, and information concerning Marsh's claimed injury, yet ultimately exonerated Marsh without identifying any violation of departmental policy, directive, procedure, or training.

303. The significance of the Internal Affairs disposition is not simply that Plaintiff disagrees with its conclusion. MTPD possessed objective surveillance evidence against which Marsh's conduct and official reporting could be tested. Marsh reported only a "Take Down," while Plaintiff alleges repeated chokeholds during separate stages of the encounter; Marsh reported an officer injury, while objective evidence existed concerning the circumstances and claimed mechanism of that injury; and Marsh failed to activate his BWC, yet the disposition identified no BWC-related deficiency or corrective action. Nevertheless, MTPD categorically declared Marsh "EXONERATED" and identified no reporting, remedial, disciplinary, policy, or training violation.

304. Plaintiff alleges that the failure to identify and address material discrepancies between the objective surveillance evidence and Marsh's official Use of Force reporting, together with the unexplained BWC non-activation and the categorical exoneration of the conduct depicted on the surveillance video, provides evidence of inadequate supervision, command-level review, investigation, discipline, and accountability.

305. Plaintiff alleges that discovery will show whether the exoneration and related investigative response were consistent with, and evidence of, broader customs or practices rather than an isolated mistake.

306. Plaintiff further alleges that policymakers knew or should have known of the obvious risk that constitutional violations would occur absent effective training, supervision, investigation, discipline, and enforcement of truthful reporting requirements, but failed to take reasonable corrective measures.

307. These policies, customs, practices, and deliberately indifferent failures were moving forces behind the violations of Plaintiff's constitutional rights and caused her injuries.

## COUNT EIGHT
## MUNICIPAL LIABILITY — 42 U.S.C. § 1983 / MONELL

**Against Monroe Township Board of Education**

308. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

309. The Board is subject to liability under 42 U.S.C. § 1983 only for constitutional injuries caused by its own official policies, customs, practices, decisions of final policymakers, and/or deliberately indifferent failures to train or supervise, and not merely because it employed persons involved in the events alleged herein.

310. The events occurred inside Williamstown High School during an encounter arising directly from the implementation and enforcement of school procedures concerning a parent item drop-off and Plaintiff's request to retrieve her daughter.

311. The Principal, multiple school-security employees, an Assistant Principal, a guidance counselor, and other school personnel were present during or immediately after material portions of the encounter. School personnel became physically involved with Ms. Baxter's daughter while Marsh continued to restrain Plaintiff.

312. Plaintiff alleges, upon information and belief, that the Board was responsible for policies, training, supervision, and coordination governing school administrators and security personnel when interacting with law enforcement assigned to the school, responding to uses of force occurring on school premises, protecting parents and students during such encounters, and preserving and handling school surveillance evidence.

313. New Jersey law requires training concerning current school-resource-officer practices and concepts for persons assigned to serve as safe-schools resource officers or school liaisons to law enforcement. Plaintiff alleges that discovery will establish the respective responsibilities of Monroe, the Board, and their policymakers for Marsh's assignment to Williamstown High School and for the training, supervision, coordination, and oversight applicable to that assignment.

314. Plaintiff alleges that the conduct of multiple school personnel during the incident, including the failure to resolve the underlying school-policy issue, the physical involvement of school personnel with R.B. while force was being used against Plaintiff, and the failure to take reasonable action during a continuing use-of-force event, was not merely an isolated act but reflected deficient policies, customs, practices, training, supervision, and/or coordination for interactions between school personnel and assigned law-enforcement officers.

315. Williamstown High School also possessed surveillance video objectively depicting the encounter. Plaintiff sought access to the surveillance evidence shortly after the incident, and her criminal-defense counsel formally demanded video evidence on January 7, 2025, yet the surveillance video was not produced to the defense until November 10, 2025.

316. During that period, Marsh himself possessed a copy of the school surveillance video on his cellular telephone and was observed repeatedly viewing it while the criminal charges against Plaintiff remained pending.

317. Plaintiff alleges, upon information and belief, that discovery will establish the identity of the school and Board personnel who possessed, preserved, accessed, copied, disclosed, reviewed, and/or controlled dissemination of the surveillance video; when and how the video was provided to Marsh and/or MTPD; what requests were received for the video; and what communications occurred concerning the video and the incident.

318. Plaintiff does not allege that the Board was independently responsible for the prosecutor's criminal-discovery obligations merely because the school possessed the video. Rather, Plaintiff alleges that the Board's own policies, practices, decisions, and conduct concerning its personnel, coordination with assigned law enforcement, and preservation and handling of material surveillance evidence are proper subjects of municipal-liability discovery.

319. To the extent discovery establishes that a final Board policymaker directed, approved, ratified, or knowingly acquiesced in unconstitutional conduct, or that a Board policy, custom, practice, or deliberately indifferent failure to train or supervise was a moving force behind a constitutional deprivation, the Board is liable under 42 U.S.C. § 1983.

320. As a direct and proximate result of the Board's actionable policies, customs, practices, decisions, and/or deliberately indifferent failures, Plaintiff suffered the injuries and damages alleged herein.

**COUNT NINE**
**SUPERVISORY LIABILITY — 42 U.S.C. § 1983**
**Against Borkowski and Responsible Doe Supervisors**

321. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

322. Plaintiff alleges, upon information and belief, that Borkowski and responsible Doe supervisors had actual or constructive knowledge of deficiencies concerning use of force, supervision, truthful reporting, investigation, and discipline and personally participated in,

directed, acquiesced in, or maintained practices exhibiting deliberate indifference to the risk of constitutional injury.

323. As Chief of Police, Borkowski had supervisory responsibility over MTPD and, upon information and belief, responsibility for ensuring meaningful review of uses of force and Internal Affairs investigations, including investigations extending substantially beyond ordinary completion periods.

324. Plaintiff's Internal Affairs investigation remained pending for approximately 176 days before MTPD issued its categorical exoneration of Marsh.

325. Plaintiff alleges that discovery will identify the officials responsible for reviewing Marsh's conduct, the objective surveillance evidence, Marsh's Use of Force reporting, Marsh's failure to activate his BWC, the claimed officer injury, and the Internal Affairs disposition, and will establish the extent of each supervisory Defendant's personal involvement in the review, approval, ratification, or failure to correct the conduct and reporting at issue.

326. The deliberate indifference and personal conduct of the responsible supervisory Defendants caused or contributed to the violations and injuries alleged herein.

**COUNT TEN**
**CIVIL CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS — 42 U.S.C. § 1983**
**Against Marsh and Responsible Doe Supervisory, Internal Affairs, and School/Board Defendants**

327. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

328. Following the October 11, 2024 incident, Marsh and responsible supervisory and Internal Affairs Defendants had access to, reviewed, participated in the review of, and/or were responsible for reviewing evidence concerning Marsh's encounter with Plaintiff, including Marsh's official reports, his Use of Force submission, the surveillance video, Plaintiff's Internal Affairs complaint, Marsh's failure to activate his BWC and the absence of any

identified corrective action concerning that non-activation, witness information, and information concerning Marsh's claimed injury.

329. That evidence provided the responsible Defendants with an objective means to determine who initiated the physical confrontation, the nature and degree of force Marsh employed, whether Marsh complied with his duty to de-escalate, whether Plaintiff intentionally assaulted Marsh, and whether Marsh accurately and completely reported his own use of force.

330. The surveillance video depicts Marsh closing the distance between himself and Plaintiff, entering her personal space, pointing his finger directly in her face, and thereafter initiating physical contact after Plaintiff verbally responded and pointed back without touching him.

331. Plaintiff further alleges that Marsh placed his hand upon her throat and repeatedly employed chokeholds during separate stages of the encounter.

332. Nevertheless, Marsh's official Use of Force submission characterized his force merely as a "Take Down" and failed to report either a "Chokehold" or "Carotid Artery Restraint," although both were separately available reporting categories.

333. Marsh further supplied and/or caused to be supplied an account portraying Plaintiff as having assaulted him with her hand and/or bag and thereby portrayed Plaintiff, rather than Marsh, as the physical aggressor.

334. Plaintiff alleges that the responsible supervisory and Internal Affairs Defendants became aware of material discrepancies between Marsh's account and reporting and the objective evidence, yet failed to correct those discrepancies and instead accepted, adopted, ratified, and/or preserved the materially false and misleading official account of the encounter.

335. The responsible Defendants had ample opportunity during the command-level Use of Force review and the approximately 176-day Internal Affairs investigation to communicate

concerning Marsh's conduct, the surveillance video, his Use of Force reporting, Plaintiff's allegations, his claimed injury, and the appropriate official disposition of the incident.

336. Plaintiff alleges, upon information and belief, that following the incident, Marsh and one or more presently unidentified supervisory, investigative, and/or other responsible Defendants reached an agreement, understanding, or meeting of the minds to adopt, preserve, or perpetuate a materially false or misleading account of the encounter that portrayed Plaintiff as the aggressor, minimized or omitted the nature and extent of the force employed by Marsh, and permitted that account to remain uncorrected during the ensuing investigation and criminal proceedings.

337. The existence of that agreement and concerted action is supported by the totality of the circumstances, including Marsh's materially incomplete Use of Force reporting; the objective surveillance video contradicting material aspects of the official portrayal of the encounter; the mandatory supervisory review of that video and reporting; Plaintiff's prompt Internal Affairs complaint; the Department's prolonged opportunity to investigate and reconcile those discrepancies; Marsh's failure to activate his BWC and the absence of any identified corrective action concerning that non-activation; the failure to correct Marsh's characterization of his force; and the Department's ultimate categorical exoneration of Marsh.

338. Notwithstanding the objective evidence available to the responsible Defendants, MTPD ultimately declared Marsh "EXONERATED" and concluded that the incident violated no "rules, regulations, standard operating procedures, directives or training."

339. The Department identified no violation of Marsh's duty to de-escalate, no improper use of a chokehold or potentially deadly force, no inaccurate or incomplete Use of Force reporting, and no need for remedial training, counseling, discipline, correction of reporting, or other corrective action.

340. At the same time, the materially false and misleading portrayal of Plaintiff as the physical aggressor remained operative in the criminal proceedings against her.

341. Plaintiff's criminal-defense counsel formally demanded the surveillance video on January 7, 2025, yet the video was not produced to the defense until November 10, 2025.

342. During that period, Marsh himself possessed the surveillance video on his cellular telephone and was observed repeatedly viewing it at the courthouse while the criminal charges against Plaintiff remained pending.

343. Plaintiff alleges that the creation, adoption, preservation, and failure to correct the materially false and misleading official account, including the failure to correct Marsh's materially incomplete Use of Force reporting despite objective surveillance evidence against which that reporting could be tested, together with the categorical exoneration of Marsh, constituted overt acts in furtherance of the agreement alleged herein.

344. The object and effect of the conspiracy were to conceal Marsh's unconstitutional conduct and protect Marsh from meaningful accountability; preserve fabricated and materially misleading evidence concerning Plaintiff's alleged assaultive conduct; facilitate and prolong the criminal proceedings against Plaintiff; and impede Plaintiff's timely ability to discover, prove, and obtain meaningful redress for the constitutional violations committed against her.

345. The concerted conduct alleged herein furthered the deprivation of Plaintiff's Fourteenth Amendment right not to be subjected to criminal proceedings through knowingly fabricated or materially false evidence and furthered the continuation of the criminal proceedings against her on the basis of that evidence.

346. To the extent discovery establishes that responsible school or Board personnel knowingly joined the alleged agreement after the incident by concealing, preserving, endorsing, or facilitating the materially false account despite knowledge of the surveillance evidence, Plaintiff alleges those individuals as additional participants in the conspiracy.

347. Plaintiff does not allege that every school employee who witnessed the incident or handled the surveillance video was a member of the conspiracy. Liability is alleged only as to those individuals whom discovery establishes knowingly reached an understanding with one or more other Defendants and committed an overt act in furtherance of the unconstitutional objective.

348. The precise identities of all supervisory, Internal Affairs, and any participating school or Board personnel; their communications with Marsh and one another; the sequence of their review, possession, access, copying, or dissemination of the surveillance video and other evidence; and the extent of each participant's involvement are presently within Defendants' exclusive possession and control and will be established through discovery.

349. Plaintiff has nevertheless pleaded the presently known facts supporting the existence, period, object, overt acts, and participants in the alleged conspiracy and will substitute the true identities of the responsible Doe Defendants when learned through discovery.

350. As a direct and proximate result of the conspiracy and the overt acts undertaken in furtherance thereof, Plaintiff suffered continued deprivation of her constitutional rights, prolonged criminal prosecution, loss of liberty, legal expense, delay in obtaining evidence necessary to vindicate her rights, emotional distress, humiliation, reputational injury, fear concerning her employment and professional standing, and other compensable damages.

351. The foregoing conduct was intentional, malicious, reckless, and/or undertaken with deliberate indifference to Plaintiff's federally protected rights.

352. Plaintiff therefore seeks compensatory damages, punitive damages against the responsible individual Defendants, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NADIA BAXTER respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

a. Compensatory damages against all Defendants in an amount to be determined at trial;

b. Punitive damages against the individual Defendants where permitted by law;

c. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

d. Award pre- and post-judgment interest as permitted by law; and

e. Grant such other and further relief as the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

October 8, 2026

Respectfully submitted,

Lara K. DiFabrizio Esq.

LYONS & ASSOCIATES, P.C.
76 E. Main Street
Somerville, NJ 08876
*Attorneys for Plaintiff*